J-A12024-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DANTE S. HUFF | : | No. 1040 EDA 2017 |

Appeal from the Order March 3, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007628-2016

BEFORE: BOWES, J., OTT, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OTT, J.: **FILED JULY 03, 2018**

The Commonwealth appeals from the order entered March 3, 2017, in the Philadelphia County Court of Common Pleas, which granted Dante S. Huff's pretrial motion to suppress evidence.[1] On appeal, the Commonwealth contends the trial court erred in determining that Huff's abandonment of his car keys was coerced by the police officer's unlawful seizure, and therefore, the drugs and narcotics recovered from his vehicle must be suppressed. For the reasons that follow, we affirm.

The facts underlying this appeal are set forth by the trial court as follows:

---

[1] The Commonwealth has properly certified in its notice of appeal that the order "terminates or substantially handicaps the prosecution" pursuant to Pa.R.A.P. 311(d). Notice of Appeal, 3/22/2017.

Police Officer David Gerard testified that at around 11:30 p.m. on June 18, 2016, he was on his routine patrol in the 12th District on the 2500 block of South Bonaffon Street. On that date, Officer Gerard was working with Officer Relova, in uniform, in a marked patrol vehicle.

While driving southbound on South Bonaffon Street, Officer Gerard took notice and pointed the police spotlight at a group on individuals he observed standing under a tree. He explained that the area was completely dark. With the aid of the light, he saw four African-American men, one of whom was known to the Officer – Mr. Ernest Houston. Officer Gerard additionally testified that the group did not readily appear to be currently engaged in any criminal activity. Upon seeing the officers, Houston began walking southbound on Bonaffon Street, discarding a black object into a recycling bin in the process. While Officer Relova pursued and apprehended Houston on suspicion of a possible Violation of the Uniform Firearms Act[] (VUFA), Officer Gerard walked back towards the recycling bin and the remaining three men standing under the tree, including [Huff]. Officer Gerard retrieved a gun from the recycling bin and verbally commanded [Huff] to stop as he attempted to head northbound up the block.

There were inconsistencies in the testimony and police paperwork regarding the exact sequence of events, particularly as to when [Huff] tossed aside his keys. The inconsistencies led this Court to question the credibility of the officer. On direct examination, Officer Gerard testified that he was merely walking up the sidewalk when [Huff] dropped his keys:

> "I started walking back to where the blue recycling bin was… As I was walking up the street, I observed three males still standing in the same area… [W]hen I started getting closer, all three of them split up in different directions…. Defendant Huff started walking northbound… I observed the defendant throw a set of keys to the ground… I told him to stop, but he continued going."

Then on cross-examination, Officer Gerard stated explicitly that he was approaching the group with the intention of apprehending [Huff] based solely on his presence near Mr. Houston:

> Q: So can we agree, then, according to [the 75-48], sir, that… you and your partner were attempting to stop this man, and as he was walking away, he dropped the keys, correct?

A: Yes.

Q: Well, what were you going to stop him for? What's the answer to that question?

A: They were together.

The Court found it unclear, "based on the [75-48], as well as Officer Gerard's testimony, whether or not the keys that he claims were tossed or dropped by Mr. Huff were dropped prior to his movement towards the defendant indicating that he needed to stop. The 75-48 [was] inconsistent with Officer Gerard's testimony as well as Officer Gerard himself who went back and forth as to the sequence of events." This Court concluded that [Huff] dropped his keys after the police moved towards him and called out for him to stop.

After retrieving the keys discarded by [Huff], the officer used the remote entry key fob to identify the vehicle. Officer Gerard looked into the car window and observed empty paraphernalia on the backseat, specifically "baggies and jars." Officer Gerard relayed radio information to other officers in the area requesting that [Huff] be apprehended. Upon opening the passenger door to retrieve the registration card, he smelled the odor of fresh marijuana, but did not report any additional contraband in the front seat. From the trunk, he recovered a black backpack containing a silver revolver, surrounded by "marijuana strewn throughout the trunk."

Detective Theodore Manko, badge number 961, also testified at the hearing as the detective responsible for preparing and executing the affidavit of probable cause and search warrant. According to their paperwork and testimony, Detective Manko and Officer Gerard discovered notably different contraband. Detective Manko testified that "in the front passenger floor, there was a Speedloader with 357 magnum ammunition." Additionally, "there was a black backpack in the back with assorted narcotics. [And] there was a green bag with a Ruger 357 six-shot revolver, assorted paperwork, and narcotics paraphernalia."

Although Detective Manko executed this search alone, Detective Campbell assisted by processing the property receipts for the paraphernalia recovered from the automobile. These property receipts indicate that all the drugs and paraphernalia were recovered from the trunk, without reference to the alleged paraphernalia in plain view on the backseat. Detective Manko's

explanation for this discrepancy was that he did not "recover all the paraphernalia in the car. There was just too much to recover." Therefore, the property receipts only list what was recovered in the trunk of the car.

Trial Court Opinion, 6/30/2017, at 1-4 (record citations omitted).

Huff was arrested and charged with three drug offenses and three firearms offenses.[2] On October 12, 2016, he filed a pretrial motion to suppress the drugs and firearms recovered from his vehicle. Following a hearing conducted on March 3, 2017, the trial court granted Huff's motion. This timely Commonwealth appeal followed.[3]

The Commonwealth's sole claim on appeal is the trial court erred in suppressing the evidence recovered from Huff's vehicle. Specifically, it contends the trial court misinterpreted the facts when it found Officer Gerard instructed Huff to stop **before** Huff discarded his keys. **See** Commonwealth's Brief at 9.

Our standard of review of a trial court's order granting a defendant's motion to suppress evidence is well established:

When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider

_____

[2] **See** 35 P.S. §§ 780-113(a)(16), (30), and (32), and 18 Pa.C.S. §§ 6105, 6106, and 6108.

[3] Concomitant with its notice of appeal, on March 22, 2017, the Commonwealth filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Nevertheless, the trial court entered an order on March 24, 2017, directing the Commonwealth to file a concise statement. Thereafter, on April 5, 2017, the Commonwealth re-filed its prior concise statement.

> only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Miller*, 2012 PA Super 251, 56 A.3d 1276, 1278-79 (Pa. Super. 2012) (citations omitted). "Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions." *Commonwealth v. Brown*, 606 Pa. 198, 996 A.2d 473, 476 (2010) (citation omitted).

*Commonwealth v. Korn*, 139 A.3d 249, 252-253 (Pa. Super. 2016), *appeal denied*, 159 A.3d 933 (Pa. 2016). Moreover, we are bound by the credibility determinations of the suppression court. *Commonwealth v. Wimbush*, 750 A.2d 807, 814 (Pa. 2000)

Preliminarily, we note that in determining whether a police officer's interaction with a citizen was proper, we must bear in mind the following:

> Article I, § 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution both protect the people from unreasonable searches and seizures. Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police. The first, a "mere encounter," does not require any level of suspicion or carry any official compulsion to stop or respond. The second, an "investigative detention," permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause.
>
> In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances. …

The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and this Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs."

This Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. Officers may request identification or question an individual "so long as the officers do not convey a message that compliance with their requests is required." Although police may request a person's identification, such individual still maintains "'the right to ignore the police and go about his business.'"

*Commonwealth v. Lyles*, 97 A.3d 298, 302–303 (Pa. 2014) (internal citations omitted).

However, when officers attempt to seize a defendant or conduct an investigative detention without the requisite reasonable suspicion, any contraband the defendant abandons as a result of the unlawful seizure must be suppressed. *See Commonwealth v. Jackson*, 698 A.2d 571, 576 (Pa. 1997) ("[W]hen the causative factor in the abandonment of the evidence is an unconstitutional search and seizure, the contraband must be suppressed.") (footnote omitted); *Commonwealth v. Taggart*, 997 A.2d 1189, 1196 (Pa. Super. 2010) ("Pennsylvania courts have commonly held that contraband

- 6 -

discarded during an unlawful pursuit must be suppressed.") (citations omitted), *appeal denied*, 17 A.3d 1254 (Pa. 2011).

Here, the trial court determined Officer Gerard subjectively intended to stop Huff when he moved towards him, actually directed Huff to stop, and "made it plainly known that [Huff] was not free to leave[,]" all before Huff discarded his keys. Trial Court Opinion, 6/30/2017, at 9. The court opined:

> Officer Gerard's pursuit of [Huff] and verbal commands, compounded with police action of chasing down one of [Huff's] associates (Mr. Houston), established a sufficient show of authority for a reasonable man to believe he was being stopped.

*Id.* The court then considered whether Officer Gerard had reasonable suspicion to conclude Huff may be armed and dangerous in order to justify the stop. In finding reasonable suspicion was lacking, the court emphasized Officer Gerard's candid testimony that "the sole reason he planned to stop [Huff] was because 'they were together,' referring to Mr. Houston who'd just been arrested." *Id.* at 10. The court explained:

> [Huff's] presence near an arrestee did not provide sufficient cause to justify a seizure. Nor did his decision to turn and walk away from the officer justify a seizure.

*Id.* Consequently, the trial court concluded that Huff's abandonment of his car keys was directly caused by Officer Gerard's unlawful seizure, and, accordingly, the contraband recovered from his vehicle must be suppressed. *See id.*

The Commonwealth's primary argument on appeal is the trial court's factual finding that Officer Gerard commanded Huff to stop before Huff

discarded his keys is not supported in the record. Indeed, the Commonwealth points to the following sequence of events provided by Officer Gerard during the suppression hearing:

> I was walking towards them. [Huff] started walking away, threw the keys to the ground, then I asked him to stop.

N.T., 3/3/2017, at 26-27. **See also id.** at 16 (Officer Gerard stating he saw Huff "throw" his keys toward the curb and continue walking, when the officer "told him stop"). Accordingly, because the court's finding is not supported by the record, the Commonwealth maintains this Court is not bound by that finding on appeal. **See** Commonwealth's Brief at 13.

In a footnote, however, the Commonwealth acknowledges the court's factual finding regarding the timing of Officer Gerard's command to stop "may have been derived from the police incident report form, which was prepared by another officer, Officer Relova, and was introduced on cross examination." **Id.** at 13 n.4. The Commonwealth attempts to minimize the significance of that document by noting it does not specify "how Officer Gerard purportedly attempted to stop [Huff], much less that he 'commanded [Huff] to stop' before [Huff] tossed his keys." **Id.**

The trial court clearly states its factual findings are based on a determination that Officer Gerard was not credible. **See** Trial Court Opinion, 6/30/2017, at 4. Indeed, although Officer Gerard testified Huff dropped his keys **before** the officer directed him to stop, **see** N.T., 3/3/2017, at 26-27, the officer acknowledged the police incident report filed in this case stated:

"Police attempted to stop [Huff], but he walked away north o[n] Bonaffon. Police observed male drop a set of keys on the sidewalk." *Id.* at 36.

The court was also troubled by other significant discrepancies in the police paperwork concerning the contraband found in Huff's vehicle. Officer Gerard testified he observed drug paraphernalia, baggies and jars, in the backseat of the vehicle. *See id.* at 17. Then, upon his inspection of the trunk, the officer observed a black backpack, which contained a silver revolver, as well as "marijuana strewn throughout the trunk." *Id.* at 19. However, Detective Manko, who later executed the search warrant on the vehicle, testified he recovered a firearm from the front passenger floor, and two bags from the trunk - a black back pack containing "assorted narcotics" and a green bag containing a revolver, "assorted paperwork, and narcotics paraphernalia." *Id.* at 41. Although the detective testified there was drug paraphernalia throughout the "passenger compartment [and] the trunk," the property receipts indicated all the paraphernalia was recovered from the trunk. *Id.* at 41, 43-44. Detective Manko attempted to explain this discrepancy by stating he did not "recover all the paraphernalia in the car" because "there was just too much[.]" *Id.* at 46.

Therefore, being unable to "reconcile the discrepancies" between the officers' testimony and the police paperwork,[4] the trial court found Officer Gerard's statement that he ordered Huff to stop only **after** Huff discarded his

---

[4] *See* Trial Court Opinion, 6/30/2017, at 4.

keys was not credible. We have no basis to overturn this credibility assessment on appeal. *See Wimbush*, *supra*. Furthermore, because the Commonwealth failed to demonstrate Officer Gerard possessed the requisite reasonable suspicion that Huff was armed and dangerous or that criminal activity was afoot to justify an investigatory detention, we agree with the trial court's ruling that "the causative factor in [Huff's] abandonment [of his car keys] was the illegal, coercive police action and the contraband evidence must be suppressed." Trial Court Opinion, 6/30/2017, at 10.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/3/18